# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PHILIP J. SERPICO, | ) |
| Plaintiff, | ) 16-cv-7374 |
| v. | ) Magistrate Judge Susan E. Cox |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Philip J. Serpico ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability insurance benefits under Title II of the Social Security Act ("the Act"). The parties have filed cross-motions for summary judgment. For the reasons discussed below, the Court remands this matter for further proceedings consistent with this opinion. Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [dkt. 14] is granted. The Commissioner's Motion for Summary Judgment [dkt. 21] is denied.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on March 9, 2011, with an amended onset date of February 26, 2011. [Record ("R.") 19; 472] Plaintiff was last insured for disability insurance benefits on June 30, 2012 ("DLI"). *Id.* Therefore, to obtain benefits, Plaintiff would have to establish disability onset on or before June 30, 2012.

Plaintiff's application for disability benefits was denied initially, on reconsideration, and at a hearing before Administrative Law Judge ("ALJ") Rebecca LaRiccia, who issued an unfavorable decision on March 8, 2013. [R 19-31.] Plaintiff requested review and the Appeals Council denied that request on April 29, 2014 [R 1], leaving the ALJ's decision as the final decision of the Commissioner.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

On June 19, 2014, Plaintiff filed suit in this Court (N.D. Ill. Case No. 14-cv-4624), and on March 6, 2015, the Court entered an agreed remand in this case, pursuant to joint stipulation by the parties. [R 538.] After the remand, a new ALJ, Kimberly S. Cromer, held an administrative hearing on April 4, 2016. [R 472-519.] On April 25, 2016, ALJ Cromer issued a written decision finding Plaintiff not disabled within the meaning of the Act and denying the Plaintiff disability benefits. [R 452-63.]

## II.    FACTUAL BACKGROUND

### A.  Medical History

In terms of the Plaintiff's alleged impairments, the appropriate period at issue is from the amended onset of disability February 26, 2011 through June 30, 2012, his date last insured. However, a more detailed synopsis is needed and will be recited here to understand Plaintiff's longitudinal medical history.

Plaintiff underwent bilateral inguinal hernia repair surgery in December 2005, which caused numbness, paresthesia[2], and weakness in his right leg. [R. 345.] On August 25, 2008, neurologist Dr. Julie Schwartzbard, M.D., noted that while motor strength was 5/5, Plaintiff displayed decreased sensation on the anterior and lateral portions of the right thigh, with dysesthesia[3] that did not respond to the medications Neurontin and Elavil, as well as a mildly depressed reflex in the right leg. [R 347.] The impression was presumptive femoral nerve damage perioperatively. [R 457.] On November 18, 2011, Dr. Schwartzbard noted that Plaintiff had "modestly improved" on Lyrica, but "continued to have significant complaints", including bilateral groin pain, so Dr. Schwartzbard increased Plaintiff's Lyrica dosage. [R 344.] A November 22, 2008 MRI of Plaintiff's lumbar spine revealed multilevel moderate spondylosis;[4] a small central disk protrusion at L1-L2; a right paracentral to lateral disk

---

[2] "A spontaneous abnormal usually nonpainful sensation (*e.g.*, burning, pricking); may be due to lesions of both the central and peripheral nervous systems." Stedman's Medical Dictionary at 653800.

[3] "A condition in which a disagreeable sensation is produced by ordinary stimuli; caused by lesions of the sensory pathways, peripheral or central." Stedman's Medical Dictionary at 272280.

[4] Stiffening, fixation, or fusion of the vertebra as the result of a disease process; nonspecifically, any lesion of the spine of a degenerative nature. Stedman's Medical Dictionary at 43650 and 840410.

2

protrusion at L3-L4 disk; borderline canal stenosis at L3-L4 and L4-L5 disk levels; and mild facet arthrosis at the L4-L5 disk. [R 348-51.] On January 23, 2009, Plaintiff told Dr. Schwartzbard that Lyrica did not provide him any pain relief and he was "miserable with the pain." [R 341.] Dr. Schwartzbard's examination revealed normal strength and stride, but that Plaintiff's reflexes were depressed, and he continued to complain of pain in the bilateral groin area, right thigh, in the knuckles of his hands, and toes bilaterally. *Id.* On March 18, 2009, Dr. Schwartzbard stated that Plaintiff's pattern of right lateral thigh pain and numbness was "consistent with a distribution of the right lateral femoral nerve," and noted that Lyrica, Cymbalta, and Lidoderm patches "have been inefficacious." [R 339.] Dr. Schwartzbard could not explain Plaintiff's groin pain but stated that it was "certainly plausible that the groin pain could be referred pain from the lumbar spine." [R 340.] On June 22, 2009, Dr. Schwartzbard diagnosed the condition meralgia paresthetica.[5]

Dr. Nathaniel Pae, M.D., treated Plaintiff 12 times between November 5, 2009 and November 15, 2012. [R 370-71, 391-441.] Plaintiff complained to Dr. Pae of groin and right thigh pain, with burning and tingling that was made worse with walking, standing, and moving. [R 370, 397, 403, 421, 429, 431, 433, 438, 441.] On August 31, 2010, Dr. Pae diagnosed acute neuropathy and noted that Plaintiff had seen a pain specialist, neurologist, and orthopedist, and had explored "various options/nerve blocks and various medications." [R 401.] The ALJ notes that "[i]In March 2011, the [Plaintiff] reported that the pain was intolerable even with the medication."[6] [R 457.] On June 22, 2011, Dr. Pae observed that Plaintiff's touch and pain sensations were reduced in the right leg, and diagnosed Plaintiff with neuropathic peripheral nerve and lateral cutaneous femoral nerve of thigh compression. [R 371.] On August 1, 2011, Dr. Pae noted that the maximum dose of Gabapentin did

---

[5] Meraliga paresthetica is a "burning pain, tingling, pruritus, or formication along the lateral aspect of the thigh in the distribution of the lateral femoral cutaneous nerve due to entrapment of that nerve." Stedman's Medical Dictionary at 542360.

[6] Due to a copying defect, it is unclear whether the ALJ interpreted the record correctly on this point, as the medical record for the March 3, 2011 visit with Dr. Pae appears to read: "[n]o side effects with medication and pain is tolerable." [Exhibit 11F/24-25; R441-42.]

3

not control Plaintiff's pain as well as Lyrica, but that Plaintiff was not able to obtain Lyrica due to insurance issues. [R 433-34.] On November 11, 2011, Plaintiff's follow-up examination with Dr. Pae revealed chronic pain and "burning and pain with nerves of the groin/legs." [R 431.] On January 3, 2012, Plaintiff's pain was "stable on regimen of Lyrica and Norco for breakthrough pain." [R 429.] On November 15, 2012, Dr. Pae noted that Plaintiff had "no change of symptoms," and again noted that Plaintiff was stable on Norco and Lyrica. [R 421.]

On May 31, 2011, Plaintiff underwent a consultative examination by Dr. Dilip Patel, M.D. [R 360-61.] During that examination, Plaintiff displayed diminished touch sensation in his right thigh. [R 361.] On June 20, 2011, a non-examining State agency physician Dr. Richard Bilinsky, M.D. opined that Plaintiff's right lower extremity pain was non-severe. [R 363-65.] On September 30, 2011, Dr. George Andrews, M.D., another non-examining State agency physician, affirmed Dr. Bilinsky's opinion. [R 373-75.] On December 28, 2012, Dr. Pae completed a physical residual functional capacity ("RFC") questionnaire. [R 445-48.] Dr. Pae noted that he had first seen Plaintiff on December 29, 2004, and listed Plaintiff's symptoms as chronic, severe pain in the groin area and severe right leg pain, and noted that Plaintiff "had failed nerve blocks for pain control." [R 445.] Dr. Pae opined that Plaintiff was unable to maintain gainful employment as he could sit for less than two hours, and stand/walk for less than two hours in an eight-hour workday. [R 446-37.] Dr. Pae also opined that Plaintiff would require a job that allowed him to shift positions at will from sitting, standing, or walking, and would need to take one to two unscheduled breaks per day lasting 10 to 15 minutes. [R 447.] He further stated that Mr. Serpico could rarely twist, stoop, crouch, climb ladders, or climb stairs, and would be absent about four days per month due to his impairments. [R 448.] Dr. Pae stated that these limitations were present as of 2005. [R 445.]

Plaintiff continued to treat with Dr. Pae in 2013 [R 796, 801, 806], as well as other physicians, at the Elmhurst Clinic. [R 732-834.] At a May 21, 2013 neurological consultation with Dr. Adebukola Onibokun, M.D., Plaintiff complained of intermittent groin pain at a 7/10 level, located in his right

4

anterolateral thigh, with numbness and paresthesia. [R 792.] Dr. Onibokun noted that Plaintiff had undergone extensive physical therapy and TENS unit stimulation "with no long-lasting improvement in symptoms." [R 792.] Dr. Onibokun observed that Plaintiff had decreased light touch and pinprick sensation in "the right lateral 5 out along the iliotibial band." [R 793.] On February 12, 2015, Dr. Pae drafted a general letter stating that Plaintiff suffered from chronic pain syndrome and severe neuropathic pain "which has caused him to be disabled and unable to work." [R 921.] Dr. Pae noted that Plaintiff had been treated with pain medications and seen various specialists, but his pain did not improve with either. [R 921.] On August 11, 2015, Plaintiff was seen by Dr. Sean Salehi, M.D., a neurosurgeon, to whom Plaintiff complained of significant right meralgia paresthetica, with diffuse pain the abdomen worsened with any sitting, standing, moving, wearing a seat belt, pants, and underwear, with radiating pain in the right buttock radiating in the groin region and down the right lateral thigh. [R 685-87.] Dr. Salehi observed decreased sensation in the right lateral thigh, medial calf and foot, with diminished deep tendon reflexes in the upper and lower extremities. [R 687.] On February 24, 2016, Dr. Dragan Gastevski, M.D., a pain management physician, examined Plaintiff, and noted that he displayed reproducible pain on palpation below the inguinal ligament over the femoral nerve, rating into the right groin and lateral aspect of the right thigh. [R 898.] Dr. Gastevski's diagnosed Plaintiff with femoral neuropathy with associated pain of the right lower extremity. *Id.*

### B. First Administrative Hearing

At the first administrative hearing, held on December 5, 2012, Plaintiff testified that he experienced pain in his groin, right leg, abdomen, and feet, along with severe nausea, "which is probably the worst" [R 66.] Although Plaintiff's average pain level was a 10/10, pain medications reduced his pain level to an 8/10, but Plaintiff did not go to the emergency room whenever he had this level of pain since Plaintiff's doctors allegedly told him there was nothing they could do. *Id.* Plaintiff testified that his pain limited his ability to dress himself, walk, get in and out of a car, use the toilet, and shower [R 68]; walking produced groin pain, leg cramping, and pain that felt like an electrical shock, a

charlie-horse, and a tearing/stretching feeling [R 69]; sitting could be "quite uncomfortable." [R 70.] Plaintiff experienced bad days (at a rate of more than two per month) where he could not do anything and relied on his 14 year old son for assistance, while on a good day, he experienced leg numbness and groin pain. [R 73; 79-80.] Plaintiff claimed he did not show signs of being in pain while interviewing with an SSA field office employee because he is not melodramatic about his pain and was raised by a marine. [R 85].

Additionally, a vocational expert ("VE"), Michelle Peters-Pagella, also appeared and testified at the first administrative hearing, as did Plaintiff's mother, Joanne Serpico. [R.57.]

### C. Second Administrative Hearing

At the second administrative hearing, held on April 4, 2016, Plaintiff testified that prior to his DLI, he treated his groin pain with Lyrica, Hydrocodone, pain patches, and a TENS unit. [R 489.] At the time in question, Plaintiff cooked meals, but nothing that required more than 30 minutes of standing at the stove, and his children assisted with household chores, such as sweeping, mopping, laundry, dishes, and cooking [R 491.] When at home, Plaintiff typically sat with his feet elevated with his back at a 90 degree angle, or, if nauseous, he would "try and just lay flat on [his] back with no pillow and just try and fall asleep" [R 492]. Plaintiff had difficulty with concentration and focus and had difficulties getting along with people such that he might "get aggressive in tone and speech" in a way that makes it hard to communicate with others due to the pain. [R 494-96]; Plaintiff testified that his girlfriend tells him all the time that he is "completely different" when he is in pain. [R 496.] Plaintiff is the owner of a sports bar and manages that bar on a part-time basis. [R 63; 506-07.] Plaintiff is also certified as an electrician and had formerly worked as a construction electrician. [R 507; 509.]

Also appearing and testifying at the second administrative hearing were two medical experts ("ME"): Ashok Jilhewar, M.D. and Gina LaFleur Spiegel, PsyD.[7] [R 472.] Additionally, Glee Ann L.

---

[7] The ALJ's decision incorrectly identifies the MEs who testified at the second hearing. [R 452.] The ALJ noted: "[a]lso appearing and testifying were Mednick Associates LLC, an impartial medical expert…" *Id.* While Mednick

Kehr, appeared and testified as a VE. *Id.*

### D. The ALJ's Decision

On April 25, 20016, the ALJ issued a written decision denying Plaintiff's disability benefits. [R 452-63.] As an initial matter, the ALJ found Plaintiff met the insured status requirements of the Act through June 30, 2012. [R 454.] Applying the five-step sequential evaluation process pursuant to 20 C.F.R. § 404.1520(a), the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity between February 25, 2011 through his DLI. *Id.* At step two, the ALJ determined that Plaintiff had the severe impairments of meralgia paresthetica and history of hernia repair; chronic bilateral groin pain, neuropathic in nature; lumbar degenerative disc disease; and facet arthritis. *Id.* The ALJ also addressed Plaintiff's carpal tunnel syndrome and mild obesity and found these to be non-severe impairments. [R 455.] At step three, the ALJ found that Plaintiff's impairments did not meet the severity requirements of the listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Before step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC")[8] to perform light work as defined in 20 CFR 404.1567(a),

> except can stand/walk up to six hours but need to sit/stand at intervals. After sitting for one hour, the [Plaintiff] must stand for five minutes. The [Plaintiff] can do no climbing of ladders ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; frequent bilateral handling and fingering; and frequent reaching in all directions and overhead. The [Plaintiff] must avoid work at unprotected heights and work in environments of concentrated exposure to workplace hazards such as large moving machinery and vibration. The [Plaintiff] can do no commercial driving.

[R. 455.] To support her RFC determination, the ALJ engaged in a two part analysis concerning whether Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's pain and then how the intensity, persistence, and effects of this pain limited Plaintiff's functioning. [R. 456.] The ALJ found that Plaintiff's "medically determinable impairments could

---

Associates, LLC is the name of the company for which Dr. Spiegel works [R 903], a corporate entity cannot appear and testify as a medical expert, so this error is perplexing. Equally perplexing, the ALJ also fails at the outset of her decision to even identify Dr. Jilhewar as an expert who testified at the hearing. [R 452.]

[8] RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

7

reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* The ALJ considered Plaintiff's symptoms as reported by Plaintiff to various medical professionals and the assessments of those medical professionals, largely as has been summarized in the 'Medical History' section of this Opinion, *supra*. However, the ALJ noted (incorrectly, as discussed *infra*) that "there is a gap in treatment from 2012 until the claimant was seen in August 2015 by Dr.Salehi." [R 458.]

The ALJ discussed ME Jilhewar's testimony that due to the presence of pain symptoms and treatment with Norco and neuropathic pain and treatment with Lyrica, the Plaintiff was limited to sedentary work. [R 459.] The ALJ gave ME Jilhewar's testimony great weight because he "had the benefit of the entire record…is familiar with the disability program…listen[ed] to the [Plaintiff's] testimony…[and h]is assessment is consistent with the [Plaintiff's] history of treatment and objective medical findings." [R 460.] The ALJ did not discuss ME Spiegel's testimony. The ALJ gave less weight to the opinion of the State agency consultants (Drs. Bilinsky and Andrews) because they did not consider Plaintiff's treatment or pain history. *Id.* The ALJ noted that "[n]o controlling weight or great weight is given to the medical source statement of Dr. Pae" as it is inconsistent with other opinions of record (*e.g.*, the medical expert,[9] the neurologist, the consultative examination, and the state agency opinion.) *Id.* The ALJ found that Dr. Pae's medical source statement "lack[ed] support in his own medical evidence of record" because while Dr. Pae's progress notes revealed complaints of chronic pain, there were minimal abnormal findings on evaluation; Dr. Pae's records contained no complaints of neck pain, no indication of a worsening condition, no neurological findings, and no support for any hand limitations. *Id.* Despite giving Dr. Pae's medical source statement "[n]o controlling weight or great weight", the ALJ gave Dr. Pae's other opinions minimal weight. *Id.* Despite the longevity of the

---

[9] Once can only assume the ALJ means ME Jilhewar, as the ALJ's decision both fails to mention ME Spiegel's name and discuss her opinions. *See* Section IV(B) of this Memorandum Opinion and Order, *infra*.

treatment relationship between Plaintiff and Dr. Pae, the ALJ determined that Dr. Pae's assessment was not supported or consistent with the evidence of record, largely because while the January 2012 records indicated Plaintiff's pain was stable on medication, Plaintiff was seen by Dr. Pae in May and June of 2012 for a sore throat with no complaints of musculoskeletal problems or his chronic pain, and then Plaintiff again complained of chronic nerve pain of his groin in November 2012 with no abnormal physical findings. [R 460-61.]

The ALJ also took into account Plaintiff's testimony and found it "inconsistent and out of proportion with the medical evidence of record" noting that Plaintiff "testified that he has had treatment with medication but there was no significant change in his treatment" and that while Plaintiff testified to issues with concentration, "there is a lack of similar complaints or assessments by treating sources on this issue." [R 461.]

Given these findings, at step four, after considering the VE's testimony, the ALJ determined Plaintiff was unable to perform any past relevant work, either as a construction electrician (medium in the DOT or heavy as performed) or a tavern manager/bar manager (light in the DOT but medium as performed). *Id.* However, at step five, the ALJ found there were jobs that existed in significant numbers in the national economy Plaintiff could perform. Specifically, the ALJ relied upon VE testimony that Plaintiff could perform the unskilled sedentary jobs of address clerk, account clerk, and bench sorter. [R 462.] Because of this determination, the ALJ found Plaintiff not disabled under the Act. [R 463.]

### III. STANDARD OF REVIEW

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that

9

the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether he is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities he is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether the plaintiff is disabled as set forth in the Act, 20 C.F.R. §§ 404.1520(a) and 416.920(a), if it is supported by substantial evidence, and if it is free of legal error. 42 U.S.C. § 405(g). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Although we review the ALJ's decision deferentially, he must nevertheless build a "logical bridge" between the evidence and his conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

A "disabled" individual is one who "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a continuous period of no less than twelve months." 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). To qualify as disabled, a person's impairments must be so severe, that he is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exist in the national economy." 42 U.S.C.

§§423(d)(1)(A), 1382c(a)(3)(B).

## IV. DISCUSSION

Plaintiff seeks judicial review alleging that: a) the ALJ's evaluation of Plaintiff's symptoms was insufficient under SSR 16-3p; and b) the ALJ erred in evaluating the medical opinions of record (with respect to both Drs. Pae and Jilhewar) under 20 C.F.R. § 404.1527. [Dkt. 14, p. 1.]

### A. The ALJ's Omission of Medical Records was Harmful Error

As part of Plaintiff's argument that the ALJ's evaluation of Plaintiff's symptoms was allegedly insufficient under SSR 16-3p, the Plaintiff highlights the portion of the ALJ's decision where she incorrectly notes that "there is a gap in treatment from 2012 until the claimant was seen in August 2015 by Dr.Salehi." [R 458.] This omission is a mistake of fact, and not an insignificant one at that.

It appears that Plaintiff sought treatment on at least 38 different occasions during this 2012-2015 period;[10] the medical records for this time period comprise roughly 138+ pages of the administrative record. [largely R 737-871; 922-925.] Not all of these records deal directly with Plaintiff's chronic groin pain or the other severe impairments identified by the ALJ, but several of them do, including but not limited to: R 796 (recent physical therapy has aggravated Plaintiff's meralgia paresthetica and chronic pain syndrome); R 794 (Plaintiff feels chronic groin symptoms worsening despite being on chronic pain medications); R 792 (Plaintiff's right thigh pain is intermittent, a 7/10 intensity on average, and is not aggravated by standing or walking); R 787 (Plaintiff's meralgia paresthetica "gives him intense pain when exercising"); R 756 (discussing recent significant groin pain episode that caused Plaintiff to visit the emergency room[11]); and R 747 (no new symptoms or issues related to Plaintiff's chronic pain, but Plaintiff is "requesting note to be written on his behalf as he is

---

[10] It is unclear whether Plaintiff saw pain specialist Dr. Richard Noren during this time (R 922 references Dr. Noren as a 2015 treater of Plaintiff), but if so, Dr. Noren's medical records are missing from the administrative record.

[11] There do not appear to be any ER records related to this groin pain episode in the administrative record; the only ER records in the administrative record either post-date R 756 or are unrelated to the groin pain episode mentioned by Plaintiff in R 756. *See* the 3/18/14 to 5/12/15 Elmhurst Memorial Department ER records at R 693-731 and the 11/10/15 Broward Health Imperial Point ER records at R 911-914.

unable to work"[12]).

As the doctrine of harmless error applies in judicial review of administrative decisions (*Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010), we will analyze whether this error of omission by the ALJ is harmless or otherwise. An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The Seventh Circuit addressed similar evidentiary omissions in *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010), and determined that it is not enough to establish harmless error where the ALJ "might have reached the same result had she considered all the evidence and evaluated it [in the same way] as the government's brief…the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion." Here, as there are a significant number of medical records that the ALJ failed to address (*i.e.*, essentially the ALJ incorrectly noted that these records did not exist), some favorable to Plaintiff and some less so, it is unclear how the ALJ would have reconciled these with other evidence of record concerning Plaintiff's complaints of pain and the neurological findings of record; the court cannot predict with any degree of confidence whether the ALJ would have reached the same decision after addressing this significant chunk of medical records. Therefore, this is not harmless error, and we cannot uphold the ALJ's decision on this basis.

### B. The ALJ's Failure to Address ME's Testimony Requires Remand

The error identified above would be enough on its own to require remand in this matter. However, the Court has *sua sponte* discovered a separate basis for remand Plaintiff failed to raise, one that appears such a glaring misstep by the ALJ that the Court must also note it here: the ALJ completely failed to address (or discuss what weight she gave, if any) the opinion of testifying ME

---

[12] The administrative record gives no insight into (nor does the ALJ explore) what work Plaintiff might have been doing in February of 2015 for which he needs a doctor's note.

Gina LaFleur Spiegel, PsyD.[13]

The Seventh Circuit has noted that "where the testimony of medical experts is at issue, the ALJ is entitled to accept any part of an expert's testimony or reject it completely." *Glass v. Astrue*, 263 F. App'x 526, 529 (7th Cir. 2008); *Bunge Corp. v. Carlisle*, 227 F.3d 934, 940 (7th Cir.2000). In the instant matter, however, the ALJ discounted an entire line of evidence when she failed to address ME Spiegel's testimony. "While the ALJ cannot discount medical opinions without an explanation, neither must she provide a complete written evaluation of every piece of testimony and evidence. Rather, a decision will be upheld when an ALJ articulates, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Osborn v. Astrue*, 2010 WL 2772480, at *10 (N.D. Ill. July 12, 2010) (citing *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994) and *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995) (signals omitted)); *see also Watson v. Bowen*, 880 F.2d 417 (9th Cir. 1989) (citation omitted) ("ALJ may disregard uncontroverted medical expert testimony only if he sets forth clear and convincing specific reasons for doing so"; thus, it was error where "ALJ did not discuss [doctor's] conclusions, let alone offer specific reasons for disregarding them."). Here, the ALJ failed to provide that minimum level of articulation required regarding the complete omission of ME Spiegel's opinions (and name, *see* fn. 7, *supra*) from her decision. The ALJ's decision cannot be upheld based on this error.

## V.    CONCLUSION

The Court reverses and remands for the ALJ to consider the entirety of the administrative record, including all pertinent medical records and testimony. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's opinion as raised by the Plaintiff in Docket No. 14.

Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [dkt. 14] is granted. The Commissioner's Motion for Summary Judgment [dkt. 21] is denied.

---

[13] During the second administrative hearing, the ALJ posed questions to the VE based on Dr. Spiegel's testimony and the ALJ's decision discusses the VE testimony based on a "severe mental impairment" hypothetical [R. 461], but the ALJ's decision ignores Dr. Spiegel in all other respects.

Entered: 10/16/2017

_____
U.S. Magistrate Judge, Susan E. Cox